377 A.2d 1315.

JOSEPH A. LANCELLOTTI *et al. vs.*
ENRICO LANCELLOTTI *a/k/a et al.*

AUGUST 15, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J.   The plaintiffs brought this civil action for equitable relief seeking to enjoin the defendants from transferring, selling or mortgaging certain real estate involved in this cause. They also request that certain deeds conveying the real estate in question from the defendant Angelina Lancellotti to the defendant Enrico Lancellotti be declared null and void and that the subject real estate be held in trust in accordance with the terms and conditions of the joint will

of defendant Angelina and her late husband Gaetano.[1] The matter was heard before a justice of the Superior Court sitting without a jury. In his decision the trial justice made certain findings relating to the testamentary intent of the testator and testatrix on the basis of which he granted the plaintiffs' prayers for relief. The case is before us on the defendants' appeal from the judgment entered pursuant to the trial justice's decision.

The facts are substantially as follows. Gaetano, who died in July 1966, and defendant Angelina Lancellotti were the parents of eight surviving children, three of whom are plaintiffs and one of whom, Enrico, also known as Harry A. Lancellotti, is one of defendants in the case at bar.

Gaetano and Angelina were the owners as joint tenants of certain real estate located at 453 Charles Street in the city of Providence, which they acquired by deed executed on March 30, 1931.

On July 20, 1960, Gaetano and Angelina executed a joint will; it is the meaning of that will which is the controlling factor in this case. As stated above, Gaetano died in July of 1966. The joint will was not probated until May 24, 1974, approximately eight years later, when a copy of the will was duly probated in the Probate Court of the city of Providence. An administrator c.t.a. was appointed and qualified. There was no appeal taken.

On August 10, 1973, Angelina conveyed the Charles Street real estate to her son Enrico. The defendant Enrico was unmarried and lived most of his life with his parents and took care of his mother after his father's decease. Angelina was approximately 82 or 83 years of age at the time of the commencement of the instant action.

---

[1] A "joint will" is a single testamentary instrument constituting or containing the wills of two or more persons and jointly executed by them as their respective wills. *Van Houten* v. *Whitaker*, 169 Cal. App.2d 510, 514, 337 P.2d 900, 903 (1959).

The will involved in this case was drafted by William G. Grande, an attorney, who is the husband of one of the plaintiffs. He was not present when the will was executed.

The plaintiffs allege in their complaint that Gaetano and Angelina wre bound by a mutual contract in their will wherein the joint tenancy in which their real estate was held was severed and a life tenancy created with the remainder to go to all the children equally, subject under the will to deductions for certain advances made by the father to some of the boys. In substance the complaint alleges that it was the intention of the parties that all of their property was to go to the survivor as a life tenant.

In their answer defendants deny that the joint will created a life estate in Angelina. They contend that the will was clear, convincing and positive that each party only devised their separate estates as life tenants and excluded property jointly held by both of them. Further they contend that Angelina was not divested of her property and had the right to convey it.

All the children, except plaintiffs, testified by deposition that their mother told them that it was always her desire and wish to give the property in question to Enrico.

Mr. Grande testified about certain conversations he had with his mother-in-law and father-in-law sometime prior to the execution of their joint will concerning how they wanted to dispose of their property. He testified that

> " 'time and again,' maybe at least 25 times, they always indicated to me, and both of them always told me that they wanted all of the children to share whatever property they owned equally."

Mr. Grande further testified that the desire to leave their property to all of the children equally was subject to deductions for certain advances the father made to some of the sons.

The defendants moved to strike the foregoing testimony on the ground that the will spoke for itself. The trial justice denied the motion to strike. He also overruled defendants' objections to similar testimony by Mr. Grande concerning statements made to him by Gaetano and Angelina as to how they wanted their property disposed of in their will.

During the hearing in the Superior Court, counsel agreed that the complaint was based on plaintiffs' claim that the mother had no right to convey the property because of the agreement that she made with her husband in the will. They also agreed that this was the key issue in the case and that the determination of this issue depended upon an interpretation of the will.

In his decision granting plaintiffs' prayers for relief, the trial justice noted that the prime issue before him was the interpretation of the will. He also noted that the only real property ever owned by the elder Lancellottis was the Charles Street property which was held in joint tenancy. He stated that the language in paragraph "Third" of the will presented the difficulty in this case. That paragraph reads as follows:

> "*THIRD:* The survivor shall take, under this will, a life estate in all the real estate of which the one, who dies first, is seized at the time of such death: provided, however, that all the real estate now owned by the testators, as joint tenants, shall upon the death of one, go to the survivor, it being the intention of the testators that the right of survivorship in such property shall take precedence over the provisions of this will.
>
> "At the death of the survivor and the termination of said life estate, the remainder shall for[2] as follows per stirpes, in fee."

After referring to the conflicting contentions of the parties, namely, plaintiffs' contention that their mother had no

---

[2] Counsel stipulated that the word "for" should be "go".

right to transfer the property as she only had a life estate, and defendants' contention that the mother held the property in fee simple absolute as a result of the survivorship aspect of the joint tenancy, the trial justice made the following finding:

> "The language in paragraph 'THIRD:' of the will, at first blush, seems clear – a life estate in the survivor with the exception of jointly held property. However, when one reads the will in its entirety it is obvious that this paragraph is ambiguous and to allow the fee to rest in the survivor would defeat the very purpose of the will."

After finding that there was an ambiguity in the will, the trial justice ruled that when there is language in a will that creates an ambiguity, it is the obligation of the court to ascertain the dispositive intent by considering the instrument in its entirety and also by taking into consideration the circumstances surrounding its formulation. He also discussed Mr. Grande's testimony that it was the intent of the elder Lancellottis that the Charles Street property was not to be excluded from the contractual terms of the joint will and that it was their wish and desire that the survivor receive a life estate in the property with the remainder going to the children equally, subject to deductions for certain advancement.

The trial justice also discussed the testimony given by Angelina in a deposition taken on March 13, 1974. He concluded that Mr. Grande's testimony left no doubt as to the intent of his mother-in-law and his father-in-law and, after considering all the factors before him, he found that Gaetano intended a life estate to vest in the survivor.

With respect to the severance of the joint tenancy, the trial justice held that the joint will, which the parties declared to be contractual, effected a valid severance of the jointly held property and, upon the death of Gaetano, the

surviving wife became vested in a life estate in the realty with a remainder over to the children.

In challenging the correctness of the trial justice's decision, defendants contend in substance that the will, when read in its entirety, is clear, unambiguous and positive and not so complicated or so inartfully articulated that the ordinary, sensible, primary and common meaning contained therein cannot be given to the words as written. Further, they contend that the mutual promises and consideration in the contract as set out in their joint will deal only with the disposition of their individual and separate estates; that paragraph "Third" specifically excludes any jointly owned real estate; and that the will, and in particular paragraph "Third," is so carefully drawn to indicate that only the individual estates of the parties are subject to the life estate which is expressed therein.

To support their argument they refer specifically to language in certain portions of the will which they claim is controlling on the question of ambiguity. First they point to the following language in the preamble of the will:

> "We, GAETANO LANCELLOTTI and ANGELA LANCELLOTTI * * * mindful of the uncertainties of life and the certainties of death, and being anxious, each to make suitable provision for the other in the event of either, and also to provide for the distribution of each of our separate estates, in the event of our simultaneous deaths, do hereby make, publish and declare this to be our joint will * * * ."

Next they direct our attention to paragraph "First" which reads, in part, as follows:

> "We jointly and severally declare that the provisions hereinafter made for the disposition of property owned by each of us are the result of a contract and agreement between us * * * ."

Lastly, they refer to the language in paragraph "Third" quoted above. They contend that the only logical conclusion that may be drawn from a reading of those portions of the will in their entirety is that the language is not so ambiguous as to require interpretation; that the language used clearly shows that the parties intended that the survivor shall take a life estate except as to real estate held jointly because paragraph "Third" clearly states that the intention of the parties is that the right of survivorship shall take precedence over the provisions of the will.

We cannot agree with defendants on the issue of ambiguity. Rather, we agree with the trial justice's conclusion that while at first blush the language in paragraph "Third" seems clear, when the will is read in its entirety it is obvious that this paragraph is ambiguous. It is clear from a reading of paragraph "First" that the parties entered into a binding agreement to dispose of all of their property in the manner set forth in their joint will. The difficulty arises because of the apparent inconsistency of the provisions set forth in the first sentence of paragraph "Third." The first clause of that sentence provides for a life estate "in all the real estate of which the one, who dies first, is seized at the time of such death * * * ," and the next clause carves out an exception for "all the real estate now owned by the testators, as joint tenants * * * ." When this sentence is read together with the provisions of paragraph "Fifth," which provides for certain contingencies "during the life of the life tenant herein", an ambiguity arises as to just what the dispositive intent of the parties was with respect to their real estate. In such circumstances it is the duty of the court to ascertain the testator's dispositive intent as it is expressed in the will by considering the circumstances surrounding its formulation and effectuate that intent so long as it is not contrary to law. *Lux* v. *Lux*, 109 R.I. 592, 596, 288 A.2d 701, 704 (1972).

As the court said in *Manufacturers Nat'l Bank* v. *McCoy*, 100 R.I. 154 at 158-59, 212 A.2d 53 at 55 (1965):

"It is only when in the search we find, instead of evidence of intention, ambiguity or doubt as to intention or language equally susceptible of conflicting inferences as to what was the dispositive intent that we resort to the rules of contruction. [Citation omitted.] When obscurity exists and the constructional aids are invoked, they are not applied as rules of positive law, or for the purpose of discovering an undisclosed intention of the testator, but to test an otherwise obscure intention by the application of constructional preferences for the purpose of reaching a judicial determination. [Citation omitted.] This process, according to some of the text writers, involves, within the context of the testamentary language and the circumstances attendant upon the instrument's formulation, an ascertainment of what would have been the probable intention of the average testator faced with the particular problem.

We must also remember that in construing the will we must "throw our minds back" to the time when it was made. *Pell* v. *Mercer*, 14 R.I. 412, 429 (1884); *Carpenter* v. *Smith*, 79 R.I. 326, 332, 89 A.2d 168, 171 (1952), and examine the circumstances surrounding its formulation. Mr. Grande's testimony was admissible for the purpose of showing the circumstances surrounding the formulation of the will. It is clear from his testimony that it was the desire of both parties at the time of making of the will that the survivor receive a life estate in all property, with the remainder to pass to the children equally, less certain advancements.

We consider next defendants' argument with respect to the severance of the joint tenancy. They contend that:

"A will devising a joint tenancy into a life estate could have no legal effect because joint ownership can only be severed by voluntary acts during their lifetime such as by a conveyance or contract or by a third-party or a conveyance during their lifetime to a third-party or parties by reserving life estates in themselves with re-

mainder over to third parties or involuntary by operation of law."

The short answer to this argument is that a severance did take place by a valid and enforceable contract during the lifetime of the parties by the execution of the joint will. The parties themselves declared that the joint will was contractual, and there is nothing in this record indicating that it was modified in any way by a subsequent agreement. Thus, Angelina was bound by the terms of that contract and upon the death of her husband, she became vested in a life estate in the real estate with a remainder over to the children.[3]

Before concluding, we point out that this is not a case involving the reformation of a will, as defendants contend; rather this is a case involving the construction of an ambiguous will. The defendants have failed to convince us that the trial justice overlooked or misconceived any material evidence.

The defendants' appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.

MR. JUSTICE KELLEHER, with whom MR. JUSTICE JOSLIN joins, dissenting.   It is a well-recognized principle that joint tenants may, by their mutual consent, sever their joint tenancies. 2 Tiffany, *Real Property* §425 at 210 (3d ed. 1939; 4 Thompson, *Real Property* §1795 at 123 (1961); Annot., 64 A.L.R.2d 918 (1959). Such a result necessarily follows because one tenant may sever the estate without the consent of a co-tenant by conveying his interest to a third party. *Williams* v. *Williams,* 68 R.I. 233, 27 A.2d 176 (1942). However, the mere fact that joint tenants execute a

---

[3]For cases which have considered the question of severance of jointly held property during the lifetime of the parties by a joint will see *Rucker* v. *Harris,* 91 Ill. App.2d 208, 234 N.E.2d 392 (1968); *Lawrence* v. *Ashba,* 115 Ind. App. 485, 59 N.E.2d 568 (1945); *Berry* v. *Berry,* 168 Kan. 253, 212 P.2d 283 (1949); *Sevel* v. *Swarzman,* 33 N.J. Super. 198, 109 A.2d 685 (1954).

joint will which provides for the disposition of property after the death of the survivor does not in and of itself terminate the joint tenancy. *Jerzyk* v. *Marciniak,* 10 Ill. 2d 529, 140 N.E.2d 692 (1957).

In determining whether an act of a joint tenant is sufficient to terminate or sever a joint tenancy, courts have historically resolved the question upon an analysis of whether the act destroyed one of the essential four unities of time, title, interest or possession. 2 Blackstone, Commentaries ch. 12 at 363 (Chase ed. 1914); 4 Thompson, *Real Property, supra,* §§1780-81; 2 Tiffany, *Real Property, supra* at 208-09. *See Millman* v. *Streeter,* 66 R.I. 341, 19 A.2d 254 (1941). With the advent of the eighteenth century several English courts began to accept the principle that the determination of a severance should be controlled by the tenants' intention as manifested by some overt act or express agreement. Annot., 64 A.L.R.2d 918, 941-45 (1959). This view now appears to be the prevailing trend. *McDonald* v. *Morley,* 15 Cal. 2d 409, 101 P.2d 690 (1940); *Mann* v. *Bradley,* 188 Colo. 392, 535 P.2d 213 (1975); *Duncan* v. *Suhy,* 378 Ill. 104, 37 N.E.2d 826 (1941); *Mamalis* v. *Bornovas,* 112 N.H. 423, 297 A.2d 660 (1972); *Nichols* v. *Nichols,* 43 Wis. 2d 346, 168 N.W.2d 876 (1969); *see* Swenson and Degnan, *Severance of Joint Tenancies,* 38 Minn. L. Rev. 466, 485-87 (1954).

The question of whether and to what extent property rights have been transferred from one person to another generally is resolved upon a determination of the transferor's intent. 6 Powell, *Real Property* ¶877 at 159-60 (rev. ed. 1977); 1 Restatement *Property* §§11(1) and 12(1) (1936). This court has held that the determination of whether a joint tenancy has been created is primarily a question of whether the grantor has effectively expressed such an intent. *Coffin* v. *Short,* 82 R.I. 132, 106 A.2d 262 (1954). Further, G.L. 1956 (1969 Reenactment) §34-3-1 provides in its pertinent parts that any conveyance, gift, or

grant of real or personal property to two or more persons shall be deemed to create a tenancy in common and not a joint tenancy "unless the intention manifestly appears that such persons shall take as joint tenants * * * ." This is a statutory departure from the common law preference in favor of joint tenancy. 4 Thompson, *Real Property, supra,* §1782 at 35-36.

Since the estate arises only upon an express intent, and in many such cases the intent will be the choice of the joint tenants themselves, today courts are declining to find a severance unless either tenant or both of them clearly expressed an intention to terminate the joint estate. *Tenhet* v. *Boswell,* 18 Cal. 3d 150, 554 P.2d 330, 133 Cal. Rptr. 10 (1976); *Mamalis* v. *Bornovas, supra.*

Although a devise by one tenant will not work a severance, joint or mutual wills which are executed by both tenants and dispositive of their jointly held property upon their deaths according to a plan which is inconsistent with the rights of survivorship will sever the tenancy, but it is the agreement and not the will that effects the severance. Swenson and Degnan, *Severance of Joint Tenancies, supra.*

At this point it is fitting to set out verbatim the contractual and pertinent dispositive portions of the Lancellottis' will. They read as follows:

> *"FIRST:*  We jointly and severally declare that the provisions hereinafter made for the disposition of property owned by each of us are the result of a contract and agreement between us, that the provisions made for each of us are induced by the provisions made by the other and that the provisions made for each of us are the consideration for the provisions made each for the other. We further declare, each for himself, that neither of us would have made the provisions herein contained, for the other, had not the other made the provisions, herein contained, for him; and each of us,

in consideration of the promises and of a like promise and agreement of the other, which is hereby made, agrees not to revoke, change, alter, or amend his will, except that prior to the death of either of us this will may be changed, cancelled, annulled or amended by another will or by a codicil, duly executed by us both.
\* \* \*

"*THIRD:*   The survivor shall take, under this will, a life estate in all the real estate of which the one, who dies first, is seized at the time of such death: provided, however, that all the real estate now owned by the testators, as joint tenants, shall upon the death of one, go to the survivor, it being the intention of the testators that the right of survivorship in such property shall take precedence over the provisions of this will.

"At the death of the survivor and the termination of said life estate, the remainder shall go as follows per stirpes, in fee.

"*FOURTH:*   All of our estate, personal or real, and of every nature and description, in equal shares, per stirpes, to the following children, JOSEPH LANCELLOTTI, DANTE LANCELLOTTI, ANTHONY LANCELLOTTI, ENRICO LANCELLOTTI, ALFRED LANCELLOTTI, IDA LANCELLOTTI, GAETANO LANCELLOTTI, JR., LUCY CAITO and OLGA L. GRANDE \* \* \*.
\* \* \*

"*FIFTH:*   If, during the life of the life tenant herein, necessitous circumstances require, for the maintenance, business emergencies, hospital, medical, or other personal care, of said life tenant, the executor named herein may encumber or dispose of so much of said real or personal estate so devised herein, as may be necessary, with full power and authority in such executor to execute any and all instruments in writing

necessary to make such encumbrances and con-
veyances.

"The said executor shall distribute monthly to the life tenant any net income derived, if practicable."

Looking at the instrument executed by the Lancellottis strictly as a contract, it appears that they agreed; (1) that the joint will would remain irrevocable until such time as they executed a joint codicil or another joint will; (2) that the one who survived the other would take a life estate in any real estate which the deceased owned at the time of death, excluding, however, that real estate which at the time of the execution of the agreement they held as joint tenants; (3) that in the event the surviving spouse became ill or in need of financial assistance, the executor was authorized to sell or mortgage so much of the real and personal property "devised herein" as might be necessary; and (4) that upon the survivor's death the real and personal property remaining in the estate would be divided equally among the nine Lancellotti children.

The Lancellottis, by the explicit terms of their agreement, agreed that title to their Charles Street home would pass by the right of survivorship and not by the terms of the will because they said in simple, direct languge that the real estate which they jointly owned on the day they executed the contract was to be excluded from the dispositive provisions of the will. They also agreed that if the surviving spouse needed financial help, the real and personal property "devised herein" would be the source of financial assistance. Consequently, it is obvious that the executor could not consider the Charles Street property as being available for the support of the life tenant because it was not part of the real property which had been, in the language of the Fifth clause, "devised herein."

Both the trial justice and the majority have referred to the holding in *In re Berry's Estate*, 168 Kan. 253, 212 P.2d 283

(1949). A cursory glance at the Berry contract shows the presence of the necessary clear expression of the intent to sever. Mr. and Mrs. Berry had been married before, and each had three children by their previous marriages. Their agreement reads as follows:

> " 'We each agree and direct that upon the death of the first one of us the survivor shall take a life estate in all the property of the deceased, both real and personal and upon the death of the survivor, all the property, both real and personal, shall descend and be divided among the respective children of each. That is to say: one-half of said property shall be divided share and share alike among the three children of Lon Berry and one-half of said property, share and share alike, among the three children of Ethel Berry. The respective parties to this will have been married before and each have three children by former marriages. ... ' " *Id.* at 254, 212 P.2d at 285.

The difference between the Berry and Lancellotti contracts is as obvious as the difference between night and day. The Berrys agreed that upon the death of one, the other would take a life estate in *all* of the property of the deceased, both real and personal, and when the survivor died, all of the property would be divided so that one-half would be shared equally by the husband's children, while the other half would be shared in a like manner by the wife's children.

This court on innumerable occasions has stressed that the clear and unambiguous language in a written contract is controlling as to the intent of the parties and thus governs the legal consequences of the contract provisions. The intent sought is not some undisclosed intent that might have existed in the minds of the contracting parties, but the intent which has been expressed by the language contained in the contract. *Woonsocket Teachers' Guild* v. *School Comm.*, 117 R.I. 373, 367 A.2d 203 (1976); *Theroux* v. *Bay Associates, Inc.*, 114 R.I. 746, 339 A.2d 266 (1975);

*Flanagan* v. *Kelly's Sys. of New England, Inc.*, 109 R.I. 388, 286 A.2d 249 (1972); *Hill* v. *M.S. Alper & Sons, Inc.*, 106 R.I. 38, 256 A.2d 10 (1969); *John F. Davis Co.* v. *Shepard Co.*, 71 R.I. 499, 47 A.2d 635 (1946). The exact language used by the Lancellottis leads to the inescapable conclusion that they never intended to sever the joint tenancy.

To put it another way, since there was no "clearly expressed intention" in the Lancellottis' will to terminate the mutual rights of survivorship to the jointly held 1960 real estate, I would reverse the trial justice.

If one looked solely at the dispositive portions of the Lancellottis' will, he would reach the identical conclusion as he did when he looked upon the 1960 instrument as a contract rather than a testamentary instrument. In *Edwards* v. *DeSimone*, 105 R.I. 335, 252 A.2d 327 (1969), we alluded to and adopted as our guide in that case the oft-repeated principle that when the dominant testamentary intent can be ascertained from the four corners of the will, resort to rules of construction or extrinsic evidence is unnecesary and improper.

In the Third clause of the will, the Lancellottis have explicitly provided for two possibilities: the disposition of the real estate they jointly held on July 20, 1960, the day they signed their will, and the disposition of any real estate that the one who predeceased the other might own in his or her individual right at the time of his or her decease. The majority apparently believe that because the will contains a proviso calling for the care of the life tenant, this particular stipulation in and of itself destroyed the joint tenancy. This just does not add up in light of the language which specifically states that the financial source of the life tenant's care is to be the real and personal property "devised herein." Earlier on, the Lancellottis had made it crystal clear that their jointly owned property would not pass under the terms of the will, and consequently the Lancellottis' homestead

cannot, by any stretch of the imagination, be considered as having been "devised herein."

Even if, however, an ambiguity does exist, the general rule is that extrinsic evidence of the testator's direct declarations of intent is inadmissible to alter the legal effect of the language of the will, either by adding to it or departing from it. 4 Bowe-Parker, *Page on Wills* §32.9 at 266-270 (rev. ed. 1961).[1] This is true even where the person testifying to such declarations is the attorney or scrivener who drafted the document. *Id. Rhode Island Hosp. Trust Co.* v. *Bateman*, 93 R.I. 116, 172 A.2d 84 (1961); *Hanley* v. *Fernell*, 54 R.I. 84, 170 A. 88 (1934). Thus, the trial justice erred when he permitted the will's draftsman to testify as to what Mr. Lancellotti's intent was when he signed the 1960 document.

Working still, then, on the assumption that there is an ambiguity, it seems to me that we should look to the document itself and apply the rules of construction to it. As noted before, the will's Third clause provides for two possibilities: jointly or separately held property. There is no clause in the will specifically stating that the Lancellottis intended by the will contract to sever any joint interests they had. Indeed, the will specifically provides to the contrary when it states that it is "the intention of the testators that the right of survivorship in such [joint] property shall take precedence over the provisions of this will." By saying that the will contract constituted an agreement between the Lancellottis to sever

---

[1] This rule does have an exception, not pertinent here, which permits extrinsic evidence in situations of "equivocation," where the ambiguity involves an accurate description applying equally well to two or more persons or things fitting the same description. 4 Bowe-Parker, *Page on Wills* §32.9 at 270-71 (rev. ed. 1961). The rule barring extrinsic evidence of intent is also to be distinguished from that which permits evidence pertaining to circumstances surrounding the making of a will. The case before us concerns *intent*, not surrounding circumstances.

It is worth noting that neither *Lux* v. *Lux*, 109 R.I. 592, 288 A.2d 701 (1972), nor *Manufacturers Nat'l Bank* v. *McCoy*, 100 R.I. 154, 212 A.2d 53 (1965), cited by the majority for the proposition that it is the court's duty to determine the testator's intent, involved the use of extrinsic evidence to accomplish that purpose.

any joint interests, the majority nullify the Third clause insofar as it pertains to joint property. Their construction runs counter to the well-recognized rule which I think should govern if in fact an ambiguity does exist: this court will not interpret the language of a will "so as to render its inclusion a meaningless gesture." *Souza* v. *Rodrigues*, 114 R.I. 425, 428, 334 A.2d 420, 422 (1975). By its action today the majority render a part of the Third clause superfluous.

In his testimony the draftsman of the Lancellottis' will referred to the fact that he employed a form book in order that he could select the proper language which would best express the intent of his in-laws. This observation prompted me to peruse the form books and, in so doing, I came upon 4 Modern Legal Forms §7912 at 788-89 (1948), where can be found a proposed joint will for a husband and wife.

An examination of the form reveals that the preamble, Second, Third, and Fifth clauses of Mr. and Mrs. Lancellotti's will can be found in the form will. In its pertinent portions the form differs from the Lancellotti will in but two respects. It does not contain an agreement calling for irrevocability, and the clause regulating the dispositon of personal property states that the personalty of the one who predeceases the other is to be held in trust for the lifetime use of the survivor, and upon the survivor's death it is to be distributed to the heirs. The personal property provision then goes on and in the identical "necessitous circumstances" language of the Lancellottis' will, the trustee is authorized to "encumber or dispose of so much of said real or personal estate so devised herein, as may be necessary * * * ." The last portion of the form's Third clause is identical to the will's Fifth clause, except that it speaks of a "Trustee," while the Lancellottis' will refers to the "executor."[2]

The form's Second clause contains a dispositive plan for

---

[2]See Appendix for the pertinent portions of the form.

the real estate when one spouse predeceases the other. Its language is identical in all respects to the plan which is found in the Third clause of the Lancellottis' will. The form gives a life estate to the survivor in all of the real estate of which the deceased was seized at the time of death and then goes on to say that all real estate jointly held as joint tenants "shall upon the death of one, go to the survivor, it being the intention of the testators that the right of survivorship in such property shall take precedence over the provisions of this will.*'" The asterisk directs one's attention to a footnote, which reads as follows:

"*This provision removes all doubt as to the effect of a joint will on the right of survivorship in joint tenant. See Duncan v. Suhy, 37 N.E.2d 826, 378 Ill. 104; Dimock v. Corwin, C.C.A.N.Y. 1939, 99 F.2d 799, affirmed 59 S. Ct. 551, 306 U.S. 363, 83 L. Ed. 763, 33 C.J. p. 908, n. 25, 27; 48 C.J.S., Joint Tenancy, p. 927 et seq."

In *Duncan* v. *Suhy*, 378 Ill. 104, 37 N.E.2d 826 (1941), to which reference has already been made, the court, in rejecting a claim that a husband and wife had agreed to sever their joint tenancy, pointed to the lack of any language indicating the transfer of any interest in the real estate from one to the other and found that the terms of the agreement were "not sufficient to sever the joint tenancy." *Id. at 111, 37 N.E.2d at 829. In Corwin* a widow was challenging a federal inheritance tax that had been imposed on the total value of stock that she and her husband held as joint tenants. The court, in upholding the tax, pointed out that neither joint tenant can defeat the right of survivorship by disposing of his or her interest in the property by will, and also stressed that unless the tenancy is severed during the joint tenants' lives, the right of survivorship persists, with the survivor taking the whole estate immediately upon the other tenant's demise.

Thus it is that the prime source of the draftsman's research tells us that the form's Second clause, which reads the same as the Lancellottis' Third clause, guarantees that the joint tenancy remains intact. Apparently, the only individuals who question this guarantee are the draftsman, the trial justice, and my Brothers of the majority.

If this dissent seems a bit on the lengthy side, it is — and with good reason. The majority have rewritten the Lancellottis' will, and this is clearly beyond the authority of this court. *Egavian* v. *Egavian*, 102 R.I. 740, 232 A.2d 789 (1967); *Smith* v. *Powers*, 83 R.I. 415, 117 A.2d 844 (1955). The majority, in finding an ambiguity when there is no ambiguity, have cast a cloud of uncertainty upon any will that has been or will be written in the future, no matter how well the instrument sets forth the testamentary intent. I must, therefore, respectfully dissent.

(Petition for reargument denied by a majority of the court.)

*Moses Kando, William G. Grande,* for plaintiffs.

*Armando O. Monaco,* for defendants.

## APPENDIX

§7912                                    WILLS                                    Ch.70

§7912.   Joint Will — Husband and Wife

We, _____ and _____, husband and wife, mindful of the uncertainties of life and the certainties of death, and being anxious, each to make suitable provision for the other in the event of either, and also to provide for the distribution of each of our separate estates, in the event of our simultaneous deaths, do hereby make, publish, and declare this to be our joint will, hereby expressly revoking any and all prior wills, by us, or either of us, heretofore made.

First: It is our joint will that out of the estate of the one who predeceases the other, all the just debts and expenses of administration, including the cost of a suitable monument in memory of the deceased, be fully paid, together with all State and Federal taxes and impositions that may be laid against the share of any legatee or devisee mentioned herein.

Second: The survivor shall take, under this will, a life estate in all the real estate of which the one, who first dies, is seized at the time of such death; provided, however, that all the real estate now owned by the testators, as joint tenants, shall upon the death of one, go to the survivor, it being the intention of the testators that the right of survivorship in such property shall take precedence over the provisions of this will.*

At the death of the survivor and the termination of said life estate, the remainder shall go, in equal parts to the children of the deceased, and their descendants per stirpes, in fee.

Third: All of the personal property of the one, who shall predecease the other, shall go to _____, to hold as trustee, for the use of the survivor, during the life of said survivor, subject to the following rights, powers and duties of said trustee, and at the death of said survivor the said trustee shall distribute the amount in equal parts to the heirs of the testators in equal parts and their descendants, per stirpes. If, during the life of the life tenant herein, necessitous circumstances require, for the maintenance, business emergencies, hospital, medical or other personal care, of said life tenant, the said trustee may encumber or dispose of so much of said real or personal estate so devised herein, as may be necessary, with full power and authority in such trustee to execute any and all instruments in writing necessary to make such encumbrances and conveyances.

Fourth: The said trustee shall distribute to the life tenant the net income derived from said trust, which may be determined by the following: * * * .

---

*This provision removes all doubt as to the effect of a joint will on the right of survivorship in joint tenant. See *Duncan* v. *Suhy*, 37 N.E. 2d 826, 378 Ill. 104; *Dimcock* v. *Corwin*, C.C.A.N.Y. 1939, 99 F.2d 799, *affirmed* 59 S. Ct. 551, 306 U.S. 363, 83 L. Ed. 763, 33 S.J. p. 908, n. 25, 27; 48 C.J.S., *Joint Tenancy*, p. 927 et seq.